UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 09-10272-RGS

UNITED STATES OF AMERICA

v.

MANELENHO FERNANDES

<u>FINDINGS OF FACT, RULINGS OF
LAW, AND ORDER ON DEFENDANT'S
MOTIONS TO SUPPRESS</u>

April 28, 2010

STEARNS, D.J.

On October 28, 2007, as the Morabeza Night Club on Main Street in Brockton, Massachusetts, approached its 2:00 a.m. closing, defendant Manelenho Fernandes arrived on the fringe of the departing crowd. After greeting a friend in the Club's parking lot, Fernandes walked across the street, talking on his cell phone. He was grabbed by two Brockton police detectives who seized a loaded handgun hidden inside his waistband. Fernandes had no permit for the firearm.

On September 23, 2009, Fernandes was indicted by a federal grand jury as a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). Following the indictment, Fernandes moved to suppress the gun and ammunition, arguing that police had seized him without the requisite level of suspicion. The court heard testimony, including that of Fernandes, on January 22, 2010. At the parties' request, the matter was adjourned to permit the preparation of a transcript of the hearing. Further briefing followed. Argument on the motion was heard on March 19, 2010.

FINDINGS OF FACT

Based on the credible evidence offered at the hearing, I make the following findings of fact.

1. Patrolman Francis Czarnowski regularly worked Saturday night details at the Morabeza Night Club (Club). The Club is frequented by a mostly Cape Verdean clientele. The area around the Club, and particularly the parking lot of the auto repair shop across the street, was considered by Czarnowski to be a "hot spot" for criminal activity, including shootings, stabbings, and fist fights. Czarnowski had been involved in a potentially lethal shooting incident in March of 2007 when a gun fight erupted on Main Street near the Club. Czarnowski had made a number of arrests in the vicinity of the Club, including ten for illegal possession of firearms.[1]

2. At around 2:00 a.m. on the morning of October 28, 2007, Detectives James Smith and Eric Hilliard, who were dressed in plain clothes, arrived at the Club as was their custom to monitor the closing. The detectives observed "hundreds" of patrons streaming out of the Club's entrance towards Main Street, disrupting traffic. Both officers were aware of the reputation of the neighborhood for violent crime, some of which they had personally witnessed. Fearing trouble from the crowd, Hilliard summoned three other Brockton detectives (Carde, Paul, and Almeida) to act as backup, "for our safety and public safety."

---

[1]Czarnowski was not present during Fernandes's arrest. He was called as a witness by the government for the apparent purpose of establishing the reputation of the area surrounding the Club for criminal activity. He also testified to his general familiarity with gang activity in Brockton, including that of the Cape Verdean Outlaws or CVOs, a Boston-based street gang. There is no evidence that Fernandes or any of the others who were involved in the events of October 28 were members or associates of the CVOs (or any other street gang).

Shortly after 2:00 a.m., Smith and Hilliard observed a black Nissan Pathfinder pull into the parking lot of the repair shop.[2] Three individuals exited the Pathfinder.[3] Detective Smith recognized the driver as Rui Barbosa, someone whom he had previously run across while serving on details at other clubs. Smith knew that Barbosa had no connection with the CVOs. He did not recognize either of the other two men.

3. The detectives believed – mistakenly – that one of the men who had exited the Pathfinder was defendant Manelenho Fernandes.[4] They observed Fernandes, who was wearing "baggy" jeans and a mid-thigh-length white t-shirt,[5] pacing in front of the repair shop while speaking on a cell phone. The detectives were positioned some 100' away.

---

[2]This was Smith's memory of this sequence of events. Hilliard testified that he had called for backup a few minutes later after seeing John Fernandes, one of the occupants of the Pathfinder, remove a "balled up" sweatshirt from the rear seat. While it is not material to this decision, Smith's account seems the more consistent with the uninterrupted and rapid flow of events that followed (particularly given Hilliard's testimony that he had to call four times before the backup officers responded).

[3]Although Hilliard testified that at that hour, "they shouldn't be parked there," he agreed that there was nothing "strange" about a car parking in the repair shop's lot or pulling up at the Club as it closed. Both Czarnowski and Hilliard testified that there were no after-hours restrictions on parking in the lot and that Club goers often parked there.

[4]I credit Fernandes's testimony that he did not arrive at the Club with Barbosa, but that he and John Fernandes (a second cousin) were driven there by Isabelle Teixeira, a friend of the defendant's who had picked him up earlier that night at his mother's home in Boston. Teixeira had taken the defendant first to John Fernandes's house in Brockton and had then driven the two men to the Club. There, Fernandes was looking for a friend whom he was trying to contact on his cell phone. I believe that the mistaken identification on the detectives' part is attributable to the hubbub caused by the exiting crowd and the sea of unfamiliar faces.

[5]Smith and Hilliard testified that Fernandes's garb was typical of the club-going gear worn by young men in Brockton.

Fernandes "nonchalantly" touched his right hip "at least three" times with his right hand while holding the cell phone in his left.

4. Hilliard formed the belief that he had encountered Fernandes two weeks earlier when he and Smith had been called to the Club by Czarnowski.  When they arrived, Czarnowski warned them that the defendant and his friends were "CVOs out of Boston . . . here every week causing problems."[6]  On that occasion, Hilliard approached the group and told them to leave (which they did).[7]

5. Fernandes was greeted from a distance by an exiting patron.  Fernandes walked towards him and the two men briefly embraced.  Fernandes then touched his waist, as if to adjust his clothing, and walked in the direction of the Pathfinder.  Smith and Hilliard had earlier attended a Department of Alcohol, Tobacco, Firearms and Explosives (ATF)-sponsored video training lecture in which a retired Maryland police lieutenant had warned them to watch peoples' hands in a crowd and to be suspicious of "touch and turn" movements and "security checks."[8]

---

[6]Czarnowski did not recall the conversation or the incident.  He did not recognize Fernandes when he was pointed out at the hearing and was confident that he had "never personally interacted with him."  Smith also did not remember the incident or the conversation, nor did he have any recollection of having seen Fernandes before the night of the arrest.

[7]On direct examination, Hilliard testified that he did not recall when he first recognized Fernandes from this earlier encounter. On cross-examination, he testified that he recognized the defendant only after the arrest.  On redirect examination, after some prompting, he stated that he recognized Fernandes as he approached him from his vantage point across the street.  I credit Hilliard's earlier testimony.

[8]A "security check" is a reflexive patting of a concealed weapon to insure that it remains safely in place.  Smith agreed that there are many innocent reasons for someone to touch his or her waist or body.

4

6. As the detectives kept watch on the three men, Smith and Hilliard did not observe them fighting or engaged in boisterous or inappropriate behavior. They observed one of the men, later identified as John Fernandes, reach into the back seat of the Pathfinder and retrieve a rolled-up sweatshirt.[9]

7. Carde and Almeida crossed the street and confronted John Fernandes. He was frisked, as was the sweatshirt. They also searched the Pathfinder. No weapons were found. Paul frisked Barbosa who also proved to be unarmed.

8. As Manelenho Fernandes approached the repair shop parking lot, Smith and Hilliard ran up and grabbed his arms.[10] Hilliard warned Fernandes not to "do anything foolish." He then felt Fernandes's waist. Hilliard instantly recognized the contour of a gun beneath Fernandes's waistband. He removed the gun (a .380 semi-automatic revolver chambered with seven rounds of ammunition) and passed it to Almeida. When Hilliard asked Fernandes if he had a permit for the gun, Fernandes replied that he did not. He stated: "I got shot in Boston, I got problems with people out here. I wasn't planning on shooting anybody." As he was being placed in a cruiser, he called out to the crowd: "They

---

[9]Hilliard testified that John Fernandes spoke with the defendant before retrieving the sweatshirt. Smith did not recall seeing an interaction between the two men.

[10]Smith testified that he did not believe that Fernandes recognized him as a police officer. (Smith was wearing Army fatigue pants and a dark windbreaker). Hilliard testified that, although he was also in plain clothes, he "thought" that at one point Fernandes made eye contact with him and was "taken aback by it, turned around, went right back to that – the truck there."

got me with a hammer."[11]   No Miranda warnings were given until Fernandes was booked later that morning at the Brockton station.[12]

## RULINGS OF LAW

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."  Adams v. Williams, 407 U.S. 143, 145-146 (1972).  See Terry v. Ohio, 392 U.S. 1 (1968).

"[T]he police officer's action [must] be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience."  Commonwealth v. Silva, 366 Mass. 402, 406 (1974).  "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-418 (1981).  A combination of suggestive circumstances, largely innocent

---

[11]In a second motion to suppress, Fernandes moves to suppress this statement as well as the earlier statement explaining why he was carrying a gun.  He denies having made either statement, although he admits telling Hilliard that he did not possess a firearms permit.

[12]Although Detective Smith testified that Fernandes was not seized at that point, it is clear as a matter of law that he was.  See California v. Hodari D., 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").

in and of themselves, when considered in their totality, may constitute the "reasonable suspicion" necessary to justify a Terry stop, United States v. Sokolow, 490 U.S. 1, 9 (1989), particularly when viewed by an experienced police officer. United States v. Arvizu, 534 U.S. 266, 273 (2002). As in the case of an arrest, facts must be assessed in light of the collective knowledge of the officers involved. United States v. Hensley, 469 U.S. 221, 232 (1985); United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002). The test is an objective one, "view[ing] the circumstances as a whole." Whren v. United States, 517 U.S. 806, 812-813 (1996).

Where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Terry, 392 U.S. at 30. The frisk may extend beneath a person's outerwear if the officer feels a suspicious object that could be a weapon. Id. at 22-25.

"The purpose of this limited [Terry] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams, 407 U.S. at 146. "Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979).

## ULTIMATE RULINGS OF FACT AND LAW

In applying the "totality of the circumstances" test, courts have developed specific categories of indicia of suspicion, which when considered alone or in combination, may amount to the quantum of suspicion necessary to justify a Terry stop. In reviewing these categories in the context of Fernandes's case, it is easier to begin with those that are absent. The detectives were not responding to a report of a serious and ongoing crime. Compare United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1992) (officers responding to reports of gunfire). If Fernandes did recognize Hilliard as a police officer, he made no attempt to flee. Compare Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (suspect fled after looking at police). He displayed no signs of apprehension or nervousness. Compare United States v. Atlas, 94 F.3d 447, 451 (8th Cir. 1996) (suspect's eyes grew wide with surprise upon seeing police). But cf. United States v. Chavez-Valenzuela, 268 F.3d 719, 725-726 (9th Cir. 2001) (nervousness by itself is not a basis for a reasonable belief that a person is engaged in criminal activity). Nor was there anything innately suspicious about Fernandes's presence in the proximity of the Club. Compare United States v. Sears, 663 F.2d 896, 903 (9th Cir. 1981) ("The Riverside officers observed individuals in a vehicle with out-of-state license plates looking at a bank through binoculars for about ten minutes. These facts are sufficient to justify the stop.").

Also significant is the fact that the officers had no prior knowledge of Fernandes or of his reputation for criminal activity. Compare United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994) ("A third articulable factor was that Deputy Word recognized the vehicle as belonging to Huertas, and he knew that Huertas had a criminal history involving

burglaries."). Nor did the officers possess any credible information that Fernandes was a member or associate of the CVOs or another street gang. Compare United States v. Am, 564 F.3d 25, 30 (1st Cir. 2009) ("The stop occurred in a location of known gang violence based on suspicion that [defendant] was engaged in criminal activity related to his gang membership, namely carrying a weapon for protection from rival gangs."). The officers had not received a tip from a known informant that Fernandes possessed a gun. Compare Adams, 407 U.S. at 145, 146-147 (officer warned by a reliable informant that defendant had a gun tucked inside his waistband). Nor had they received an anonymous report suggesting a need for emergency action. See United States v. Holloway, 290 F.3d 1331, 1338 (11th Cir. 2002) (although the 911 calls were anonymous, the nature of the reported emergency justified a warrantless search of defendant's home for possible victims of gunfire). Cf. Florida v. J.L., 529 U.S. 266, 276 (2000) (Kennedy, J., concurring). Fernandes had not given police evasive answers or implausible explanations of his conduct. Compare Devenpeck v. Alford, 543 U.S. 146, 155-156 (2004) (individual suspected of impersonating a police officer gave inconsistent and implausible explanations for car modifications, a police radio scanner, and a pair of handcuffs). Finally, the detectives did not observe any offense being committed, even one of a minor or technical nature, that would justify a stop and arrest. See Whren, 517 U.S. at 813 (police stop for a traffic violation can lead to a search for evidence of far more serious illegal activity).

Shorn of these often cited indicia, there are only two possible bases for a finding of reasonable suspicion: (1) Fernandes's presence in a high-crime area, see United States v. Trullo, 809 F.2d 108, 111-112 (1st Cir. 1987); and (2) his arguably ambiguous touching

or patting of his waist area as he walked. See Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (strange movements justified aroused suspicion). As for the first factor, the cases are consistent in holding that mere presence in a high-crime area is insufficient to justify a Terry stop, for the reason that were it otherwise, large groups of citizens would be subject to random police searches based solely on the character of the neighborhoods in which they live (by choice or by constraint). See Wardlow, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

The second factor has a bit more heft. A gesture (like a touching of the body) that might appear perfectly innocent to a casual onlooker (scratching oneself or feeling for a wallet, for example), depending on the setting and circumstances, may nonetheless appear suspect to an experienced officer. Arvizu, 534 U.S. at 275-276 (driver's slowing down, stiffening of posture, and failure to acknowledge a law enforcement officer in rural area combined with "methodical" waving to the officer by child passengers raised reasonable suspicion for an experienced border patrol agent). See also United States v. Padilla, 548 F.3d 179, 187-188 (2d Cir. 2008) (two men walking single-file behind a third off a sidewalk onto a dark wooded path at night appeared to be readying themselves for potential robbery or drug deal). But cf. United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood."). Weighing against this factor (apart from the ambiguity of the gesture) is that its significance was not something gleaned by Smith and

Hilliard from their extensive street experience, but was rather a suggestion put forward in an ATF-training video.[13]

On balance, what the officers had was a hunch – a good one as it turned out – and they are not to be faulted for taking a proactive stance in circumstances they perceived as potentially explosive. But a salutary result (here, the seizure of the gun), cannot be used to justify a confrontation that was constitutionally flawed at its outset. This is not the balance struck by the judicially-created exclusionary rule. Cf. Smith v. Ohio, 494 U.S. 541, 543 (1990) (per curiam) ("'[J]ustify[ing] the arrest by the search and at the same time . . . the search by the arrest,' just 'will not do.'" (quoting Johnson v. United States, 333 U.S. 10, 16-17(1948))).[14]

## ORDER

For the foregoing reasons, defendant's motion to suppress the gun and ammunition

---

[13]Of the other potential indicia of suspicion suggested by the government, it concedes in its brief that there is nothing innately suspicious about a car arriving at a night club at its closing. The court also does not find anything reasonably suspicious about a person fetching a sweater or sweatshirt from a car on a cool night in late October. Finally, as indicated earlier, I do not credit the government's suggestion that Hilliard recognized Fernandes before the seizure, or that there was any credible information that Fernandes was a member of the CVOs (or any other gang).

[14]The result is not without its critics.

> Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches.

Irvine v. California, 347 U.S. 128, 136 (1954) (Jackson, J.).

11

is <u>ALLOWED</u>.[15]

           SO ORDERED.

           /s/ Richard G. Stearns

           _____
           UNITED STATES DISTRICT JUDGE

---

[15] Given the court's ruling on the Fourth Amendment issue, it follows that Fernandes's statements must be suppressed as the "fruit" of a poisonous tree. <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963). (The statements in any event have no evidentiary value without the gun and the ammunition). However, should the Court of Appeals disagree with my Fourth Amendment assessment, I would not suppress the statements as there was no independent Fifth Amendment violation. While Fernandes was seized (that is, not free to leave) at the moment he was grabbed by the officers and was therefore in custody, Hilliard's inquiry regarding Fernandes's possession of a firearms permit (that led to the explanation by Fernandes of why he was carrying a gun) falls within the "general on-the-scene questioning" exception of <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440-442 (1984). Fernandes's later exclamation: "They got me with a hammer," was a voluntary statement that was not a product of police interrogation. See <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966).